UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KAREN NELSON, on behalf of S.N., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  09-10729-JGD |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON CROSS-MOTIONS RELATING TO DENIAL
OF SUPPLEMENTAL SECURITY INCOME BENEFITS**

August 6, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Karen Nelson ("Ms. Nelson") has brought this action on behalf of her

minor daughter, S.N.,[1] pursuant to sections 205(g) and 1631(c)(3) of the Social Security

Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), in order to challenge the final decision of the

Commissioner of the Social Security Administration (the "Commissioner") denying

S.N.'s claim for Supplemental Security Income ("SSI") benefits.  The matter is presently

before the court on the plaintiff's motion for an order reversing or remanding the

---

[1]  Because S.N. is a minor child, the parties have identified her only by her initials, in
compliance with Local Rule 5.3(A)(2).

Commissioner's decision (Docket No. 14),[2] and on the "Defendant's Motion for Order

Affirming the Decision of the Commissioner" (Docket No. 15).  The fundamental issue

raised by the parties' motions is whether the Administrative Law Judge ("ALJ"), in

reaching his decision that S.N. was not disabled, erred in finding that S.N. does not have

an impairment or combination of impairments that functionally equals one of the listed

impairments set forth in the social security regulations.  For all the reasons set forth

below, this court finds that while there is evidence to the contrary, the ALJ's decision

was supported by substantial evidence.  In view of this court's limited role in reviewing

the decision of the ALJ, the plaintiff's motion to reverse or remand is DENIED and the

Commissioner's motion to affirm is ALLOWED.

## II.  **STATEMENT OF FACTS**[3]

### **Procedural History**

On December 15, 2006, Ms. Nelson filed an application for SSI benefits on behalf

of her daughter, S.N., who was nine years old at the time.  (Tr. 87).  Ms. Nelson claimed

that S.N. had been disabled since her birth in August 1997[4] as a result of asthma,

---

[2] Although the plaintiff did not file a separate motion, this court, like the parties, construes the document entitled "Plaintiff's Brief" as both a motion to reverse or remand the Commissioner's denial of SSI benefits and a memorandum of law in support of the motion.

[3] References to pages in the transcript of the record proceedings shall be cited as "Tr. __."  The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 7.

[4] Although Ms. Nelson claims that S.N. has been disabled since August 1997, SSI is not payable prior to the month following the month in which the SSI application was filed.  See 20 C.F.R. § 416.335.  Since the application was filed in December 2006, S.N. could not have been eligible for benefits prior to January 2007.

attention deficit hyperactivity disorder ("ADHD"), bipolar disorder and back problems. (Tr. 120).  The plaintiff's claim was denied after initial review on March 28, 2007.  (Tr. 57-59).  It was denied again on February 5, 2008, following a review by a Federal Reviewing Official.  (Tr. 47-56).

Ms. Nelson subsequently requested a hearing before an ALJ.  (Tr. 67).  The request was granted and a hearing took place in Providence, Rhode Island on November 13, 2008.  (Tr. 19-45).  The plaintiff was represented by counsel at the hearing.  (Tr. 19).  On December 30, 2008, the ALJ issued a decision denying the plaintiff's application for SSI benefits on the grounds that S.N. "has not been disabled, as defined in the Social Security Act, since December 15, 2006, the date the application was filed[.]"  (Dec. Finding #6, Tr. 18).

The Decision Review Board selected S.N.'s claim for review, and on April 3, 2009, it affirmed the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of review.  (Tr. 1-3).  See also 20 C.F.R. § 405.420(b)(2).  Thus, the plaintiff has exhausted all of her administrative remedies, and the case is ripe for review by this court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  As detailed below, the plaintiff is no longer pursuing benefits on the basis of her physical conditions.  Rather, her claim for benefits is limited to her psychological and emotional conditions.

**Plaintiff's Educational Background**

S.N. was born on August 5, 1997.  (Tr. 87).  She lives with both parents and has

two brothers and a stepsister.  (Tr. 349).  At the time of her application in December

2006, S.N. was nine years old and was in the second grade.  (See Tr. 196, 244).  She was

eleven years old and in the fourth grade at the time of her hearing before the ALJ.  (Tr.

25).

The record indicates that S.N. has received special educational services since

preschool, and that she has a history of language delays.  (Tr. 96).  It also indicates that

she repeated kindergarten and first grade, but not the later grades.  (Tr. 25, 128).  In 2005,

when S.N. was in the first grade, she received instruction through a developmental

resource program, and received speech/language therapy as well.  (Tr. 94, 100).  Her

records show that at that time, she was performing below grade level in reading, math and

language, she had a short attention span, and she was taking medication to improve her

focus and attention.  (Tr. 94-96, 100).  In addition, S.N. was frequently absent from

school, and had missed twenty-four days of the 2004-2005 school year as of March 15,

2005.  (Tr. 96, 100).

In March 2005, S.N. received a psychological evaluation through the public school

system as part of a three-year reevaluation of her special education program. (Tr. 96-

101).  During the evaluation, S.N. displayed good effort and attention, but did show signs

of impulsivity.  (Tr. 100).  She also appeared to have difficulty with understanding

directions and word retrieval.  (Tr. 100).  Notably, cognitive testing performed as part of

the evaluation indicated that S.N. had low-average cognitive ability and language-related learning delays, but that her perceptual reasoning ability fell within the average range. (Tr. 100).  In addition, academic testing revealed delayed reading skills and weak math reasoning skills.  (Tr. 100).  However, her written computational skills were average.  (Tr. 100).

S.N. also received language testing as part of her reevaluation.  (Tr. 102-05).  The results indicated that S.N. had a severe delay in her expressive language ability, but that her receptive vocabulary and language skills fell within the average range.  (Tr. 104). Additionally, articulation testing showed age appropriate speech sound development and intelligibility.  (Tr. 104).  Her social pragmatic use of language also was judged to be appropriate.  (Tr. 104).

In about December 2006, S.N.'s regular classroom teacher completed a written assessment in which she compared the plaintiff's abilities in six different domains of functioning to those of same-aged children in regular education.  (Tr. 196-203). According to the teacher, S.N. had only "slight" problems functioning in the domain of acquiring and using information.  (Tr. 197).  In particular, the teacher stated that the plaintiff had "some difficulty with problem-solving" and "require[d] extra time to process new information."  (Tr. 197).  The teacher also reported that S.N. had a "serious" problem completing class/homework assignments, and an "obvious" problem completing work accurately without careless mistakes, but otherwise had only some "slight" problems in the domain of attending and completing tasks.  (Tr. 198).  With respect to the

domain of interacting and relating with others, S.N.'s teacher indicated that the plaintiff had only a few "slight" problems.  (Tr. 199).  She assessed S.N. as having "no" problems in the domain of moving about and manipulating objects or in the domain of caring for herself.  (Tr. 200-01).  The teacher further noted that S.N. was frequently absent from school.  (Tr. 196, 202).

The record contains a copy of S.N.'s Individualized Education Program ("IEP") plan for the period from May 30, 2006 to May 29, 2007.  (Tr. 135-48).  It provides in relevant part that S.N. "has shown significant improvement in all areas of academics.  She has mastered all of her letter sounds and is continuing to increase her sight word knowledge.  She is very outgoing and enjoys learning.  Her math skills are also continuing to grow, just recently beginning work on money."  (Tr. 135).  However, due to "[f]actors associated with deficits in attentional skills" and "[f]actors associated with developmental delay[,]" S.N. remained hindered in "effectively addressing curricular material."  (Tr. 136).  Accordingly, the IEP plan called for S.N. to receive special education services, including English language arts instruction twice a week for thirty minutes, math instruction three times a week for thirty minutes, and speech/language therapy once a week for thirty minutes.  (Tr. 143).  Additionally, the plan provided that S.N. would receive counseling once a week for thirty minutes and adaptive physical education once a month for fifteen minutes, and it recommended certain accommodations in order for S.N. to make effective progress in school.  (Tr. 136-37, 143).  Despite these special education

services, S.N. remained in a regular education classroom most of the day, where she had

"no problems." (Tr. 132).

The record also contains a copy of S.N.'s IEP plan for the period from May 17,

2007 to May 16, 2008. (Tr. 163-76). Therein, S.N.'s IEP team expressed concern about

S.N.'s lack of motivation in school and her continuing absences. (Tr. 163). In particular,

the plan reads in relevant part as follows:

> [S.N.] is a nine-year old girl who is currently in second grade at the
> Gidley School. [S.N.] is diagnosed with Developmental Delay.
> [S.N.] receives special education services for both English Language
> Arts and Math in the resource room. [S.N.'s] excessive absences this
> year has hindered her ability to learn new skills and concepts. [S.N.]
> is reading at grade level, but struggles with comprehension. [S.N.] is
> working slightly below grade level in math. She struggles with math
> reasoning, and solving word problems. [S.N.] will often refuse to do
> her classwork, and does not complete homework. [S.N.] reports that
> she does not like school, and does not want to attend school. We
> will continue to work with [S.N.] to encourage her to do her best.
> When [S.N.] applies herself, she is able to do quality work.

(Tr. 163). S.N. continued to receive the same special education services that she had

received during the prior year. (See Tr. 172, 175). In addition, S.N.'s plan continued to

recommend that she receive certain accommodations in order to make effective progress

in school. (Tr. 164-65).

In September 2007, when S.N. was in the third grade, she took the Group Reading

Assessment and Diagnostic Evaluation, a test designed to determine what reading skills

have been learned and what skills need to be taught. (Tr. 223). The test results showed

that S.N. was achieving appropriate progress in reading, and that she was slightly below

average as compared to other third-grade students.  (Id.).  However, S.N.'s performance

on Grade 3 state-wide testing administered in the spring of 2008 showed that she was in

need of improvement.  (Tr. 225).

A Student Accommodation Plan was prepared for S.N. for the time period from

May 20, 2008 to May 20, 2009.  (Tr. 209-12).  As reported in the Plan, "[S.N.] is

struggling independently in academics particularly in the area of [English language arts].

Her attention, motivation and daily inconsistency appear to be inhibiting her ability to

make progress independently in the general education curriculum."  (Tr. 209).

Accordingly, the Plan suggested that certain accommodations be provided to S.N. as

needed.  (Tr. 209).  They included but were not limited to: frequent breaks; clarification,

repetition and simplification of test directions; untimed tests; extra time to process verbal

information; moderate teacher monitoring of independent work for comprehension; use of

visuals with oral explanations; and extra time to finish assignments.  (Tr. 209).  At the

hearing before the ALJ, S.N. testified that her grades have improved during the fourth

grade, with the highest being an "A-" and the lowest being a "C-."  (Tr. 34).

## Evidence of S.N.'s Behavior at Home

The record indicates that S.N. is outgoing and friendly, interacts well with others,

and behaves well in school.  (See Tr. 26, 95, 96, 135, 325).  During the hearing before the

ALJ, S.N. stated that she gets along well with her teachers, has friends at school, and

helps with chores at home.  (Tr. 26, 29, 30).  However, she did admit that she hits and

scratches her younger brother, gets angry at her mother when she's told to take a shower,

-8-

and has hit her mother on three occasions.  (Tr. 31, 36-37).  Additionally, S.N. testified that she sometimes feels sad and that she is sometimes unable to sleep unless she takes Melatonin.  (Tr. 38).

Ms. Nelson also testified about S.N.'s behavior at home.  In particular, she stated that S.N. "fights all the time," never wants to get up in the morning, gives her "a hard time every day" and doesn't like to be told what to do.  (Tr. 40, 42).  She also testified that S.N. has attempted to overdose on pills and has pursued her younger brother with a knife.  (Tr. 41-42).  According to Ms. Nelson, she has to keep knives up high in a cabinet to prevent S.N. from taking them.  (Tr. 41).  Additionally, when asked about how S.N. interacts with other children in the neighborhood, Ms. Nelson stated that S.N. sometimes screams at her friends and tells them "she hates them" or "wishes they were dead."  (Tr. 43).  However, Ms. Nelson admits that she has not taken S.N. to a child psychiatrist.  (Tr. 43).  According to Ms. Nelson, she has been unable to find one due to insurance issues and her inability to pay the co-payments.  (Tr. 43-44).  As detailed below, the ALJ found some of Ms. Nelson's testimony regarding "the intensity, persistence and limiting effects of the claimant's symptoms" to be not credible since it was inconsistent with other evidence in the record.  (See Dec. 6-7; Tr. 12-13).

### Evidence from Medical Sources

The plaintiff does not dispute the ALJ's conclusion that S.N. does not suffer from any severe physical impairments and that her physical conditions do not give rise to a

disability.  Therefore, this court's description of the medical evidence is limited to evidence pertaining to S.N.'s psychological and emotional conditions.

Dr. Teodor Georgescu has been S.N.'s pediatrician since 1997.  (Tr. 390).  He reports that S.N. was diagnosed with a developmental language disorder in March 2001, with ADHD in July 2002, and with "explosive behavior disorder possible bipolar disorder" in May 2005.  (Tr. 390).  Dr. Georgescu has prescribed S.N. Concerta for her ADHD, Risperdal for her bipolar disorder, and Albuterol, as needed for her asthma.  (Tr. 122).  In addition, S.N. takes Melatonin as a supplement to help her sleep.  (Tr. 394).  As detailed more fully below, the ALJ did not find all of Dr. Georgescu's opinions to be controlling where they were "inconsistent with other substantial evidence of record[.]" (Dec. 7; Tr. 13).

In December 2006, S.N. was referred by her school adjustment counselor to Seven Hills Behavioral Health ("Seven Hills") for the purpose of confirming her diagnosis of bipolar disorder.  (Tr. 348).  During the initial assessment, clinicians at Seven Hills noted that S.N. had "difficulty controlling behavior at home but does moderately well in school where there's more structure and one on one attention than at home." (Tr. 348).  They recommended that the plaintiff be evaluated by a child psychiatrist and receive independent and family counseling.  (Tr. 348).  However, after two meetings at Seven Hills, the plaintiff's treatment there was terminated because S.N.'s parents were unable to pay the deductible on their insurance policy.  (Tr. 326).

Subsequently, S.N. was referred to Steven J. Hirsch, Ph.D. for a psychological evaluation in order to assist in determining S.N.'s eligibility for disability benefits.  (Tr. 349).  Dr. Hirsch gave S.N. a number of tests and conducted an interview with her mother.  (Tr. 350).  During his evaluation, Dr. Hirsch observed, among other things, that S.N. had good hygiene skills, was alert, cooperative and oriented in person, place and time, and had clear speech.  (Tr. 350).  He also determined that her expressive vocabulary skills were in the ninth percentile for children of her age, her attention span was "somewhat variable," her reality testing was "grossly intact" and her social judgment and reasoning skills were "fair."  (Tr. 350).  Additionally, Dr. Hirsch reported that S.N.'s affect was appropriate, she was not anxious, and her frustration tolerance was good.  (Tr. 350).

Dr. Hirsch tested S.N. using the Wechsler Intelligence Scale for Children ("WISC").  (Tr. 351).  That testing "yielded a rather variable and splintered cognitive profile" with performances on subtests ranging from the 5th to the 63rd percentile.  (Tr. 351).  Dr. Hirsch also administered an Aphasia Screening Test and a Bender-Gestalt Test of Visual Perception.  (Tr. 351).  Those tests indicated weaknesses in math and spelling, borderline graphomotor ability, and poor motor planning.  (Tr. 351).  However, Dr. Hirsch found that S.N.'s reading recognition skills were relatively strong.  (Tr. 351-52).

With respect to the plaintiff's social and emotional functioning, Dr. Hirsch determined, among other things, that S.N. was having no difficulty sleeping, had a good appetite, and had no symptoms of clinical anxiety, depression or mood disregulation.  (Tr.

352).  He also noted that there was no indication of any behavioral problems in school, and that S.N. enjoyed playing with friends.  (Tr. 352).  During Dr. Hirsch's interview with S.N.'s mother, Ms. Nelson did not indicate that there were any significant behavioral problems at home.  (Tr. 352).

In March 2007, Kathryn Collins-Wooley, Ph.D., a consulting psychologist, performed an assessment of S.N.'s functional limitations by evaluating the extent of S.N.'s limitations in each of six developmental domains.  (Tr. 353-58).  In the first domain of "acquiring and using information," Dr. Collins-Wooley found that S.N. had "marked" impairments due to "language learning delays."  (Tr. 355).  In the second domain of "attending and completing tasks," she determined that S.N. had "less than marked" limitations.  (Tr. 355).  In particular, Dr. Collins-Wooley noted that S.N. had "mild inattentiveness" and was doing well on her medications.  (Tr. 355).  Dr. Collins-Wooley also concluded that S.N. had "less than marked" limitations with respect to the third domain of "interacting and relating with others."  (Tr. 355).  In particular, the consulting psychologist found that the plaintiff had only "slight difficulty moderating anger and seeking attention appropriately per teacher," but noted that she had "tantrums at home."  (Tr. 355).  With respect to the remaining domains of "moving about and manipulating objects," "caring for yourself," and "health and physical well-being," Dr. Collins-Wooley assessed S.N. as having "no" limitations.  (Tr. 356).  Based on these findings, she concluded that S.N.'s impairments, while severe, did not meet, medically

-12-

equal or functionally equal any of the listed impairments set forth in the social security regulations. (Tr. 353).

In May 2007, S.N.'s school therapist referred her to Michael D. Williams, Ph.D., a licensed psychologist, for a psychological evaluation to assess S.N.'s overall level of functioning. (Tr. 364-71). Dr. Williams performed various tests, reviewed forms from S.N.'s parents and teacher, and conducted interviews with S.N. and her mother. (Tr. 364). According to Dr. Williams, S.N.'s effort during testing "waxed and waned." (Tr. 365). As a result, Dr. Williams stated that the "results of this evaluation are considered to be an underestimate of [S.N.'s] ability, but an accurate representation of her current level of functioning – as her observed effort and behavior (passively oppositional, headstrong) is likely an accurate representation of her behavior at school as well." (Tr. 366).

In order to assess S.N.'s general cognitive functioning, Dr. Williams administered the WISC-IV. (Tr. 366). Although Dr. Williams opined that S.N.'s "inconsistent effort very likely led to results on the WISC that underestimate her 'true' abilities," he reported that S.N. was nevertheless able to obtain a verbal ability score that fell within the upper end of the low average range and a nonverbal ability score that fell within the upper end of the average range. (Tr. 367). In addition to the WISC, Dr. Williams gave S.N. the Wide Range Achievement Test – 4 ("WRAT4") in order to assess her academic skills. (Tr. 367). He reported that her word reading and spelling scores on this test fell well within the average range, but that her math computation score fell within the borderline range. (Tr. 368). According to Dr. Williams, S.N.'s performance on the WRAT4 "tends

-13-

to support the belief that her verbal ability score on the WISC is unreliable and underesti-mates her 'true' verbal ability."  (Tr. 368).  He also found it surprising that S.N. did not score better on math computation given her "much stronger nonverbal ability score on the WISC-IV," and he recommended that further testing be performed by S.N.'s school.  (Tr. 368).

Dr. Williams also performed a test aimed at assessing memory across verbal and visual domains.  (Tr. 368).  However, because the plaintiff became increasingly restless and silly during administration of the test, Dr. Williams stated that S.N.'s consistently poor results on the test were likely unreliable.  (Tr. 368).

Finally, Dr. Williams performed tests aimed at examining S.N.'s personality and emotional functioning.  (Tr. 369).  According to Dr. Williams, those tests indicated that S.N. is emotionally unstable and behaviorally impulsive, and that she lacks the ability to cope with emotional distress.  (Tr. 369).  He also stated that S.N.'s results were consistent with ADHD and bipolar disorder.  (Tr. 369).  Dr. Williams made a number of recommendations, including having S.N.'s school conduct more extensive achievement testing to more reliably assess her skills, seeking care for S.N.'s psychiatric needs from a specialist, and involving her parents in her therapy.  (Tr. 369-70).

In March 2008, Dr. Georgescu, S.N.'s treating physician, prepared a functional capacity assessment for S.N. in which he described how S.N.'s impairments affected her development and performance in six domains of functioning as compared with unimpaired children of the same age.  (Tr. 390-92).  In his report of the assessment,

Dr. Georgescu listed the plaintiff's symptoms as "inattention," "hyperactivity," "impulsivity," and "aggressive outbursts." (Tr. 390). He assessed S.N. as having "moderate" impairments in the domains of "acquiring and using information" and "caring for yourself," a "marked" impairment in the domain of "attending and completing tasks," an "extreme" impairment in the domain of "interacting and relating with others," and "none to slight" impairments in the domains of "moving about and manipulating objects" and "health and physical well-being." (Tr. 391-92). Dr. Georgescu also noted that "on March 19, we received a phone call that [S.N.] tried to swallow sleeping pills." (Tr. 392). He described this incident as a "questionable suicidal gesture" and indicated that he had referred S.N.'s parents to a crisis center. (Tr. 392).

### Reviewing Psychiatrist Opinion

In January 2008, Dr. P. Coto, an agency child psychiatrist, reviewed the plaintiff's psychiatric medical evidence in order to assess her allegations of disabling ADHD and bipolar disorder. (Tr. 373-74). Based on his review, Dr. Coto concluded that S.N. "presents a severe impairment that does not meet, equal or functional[ly] equal a list[ed] impairment." (Tr. 374). In particular, Dr. Coto determined that the medical evidence supported S.N.'s diagnoses of ADHD, learning disability and disruptive disorder, but not the diagnosis of bipolar disorder. (Tr. 374). Dr. Coto also determined, based on the records, that S.N. had "[l]ess than marked" impairments in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with

others, and that she had "[n]o limitation[s]" in the domains of moving about and manipu-
lating objects, caring for self, and health and physical well-being.  (Tr. 374).

## The ALJ's Decision

The ALJ concluded that since December 15, 2006, the date when S.N.'s applica-
tion was filed, the claimant has not been "disabled," which is defined as having "a
medically determinable physical or mental impairment, which results in marked and
severe functional limitations, and which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than 12 months."
(Dec. 1-2; Tr. 7-8).  See also 42 U.S.C. § 1382c(a)(3)(C)(i) (defining disability in
children under the age of 18).  There is no dispute that the ALJ, in reaching his decision,
applied the three-step evaluation required by 20 C.F.R. § 416.924.  However, the plaintiff
contends that the ALJ erred, by failing to find at the third step of the analysis, that S.N.
suffers from an impairment or combination of impairments that meets, medically equals,
or functionally equals a disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, of
the Social Security regulations.

The ALJ determined that S.N. had not engaged in substantial gainful activity at
any relevant time.  (Dec. Finding #2; Tr. 10).  He also determined that S.N.'s ADHD,
depression and bipolar disorder constitute "severe" impairments, but that her other
conditions, including her asthma, scoliosis, recurring tonsillitis, expressive language
disorder, learning disorder, low-average cognitive functioning, panic disorder and
oppositional defiant disorder, would cause no more than slight functional limitations and

are therefore not "severe" within the meaning of the social security regulations.  (Dec.

Finding #3; Tr. 10).  The plaintiff does not dispute those conclusions.  The ALJ further

found that S.N.'s severe impairments do not meet or medically equal a listed impairment

because "the medical and other evidence of record fails to establish the requisite 'marked

impairment' in at least 2 areas of functioning as contained in Listing 112.02(B)2 of the

Listings."  (Dec. Finding #3-4; Tr. 10).  While the plaintiff purports to dispute this

conclusion, she only argues, without analysis, that S.N.'s impairments are comparable to

the listings for ADHD and mood disorder set forth in the social security regulations.

The ALJ considered whether S.N. has an impairment or combination of

impairments that "functionally equals" the listings by evaluating whether S.N. has

"marked" limitations in at least two of six domains of functioning, or "extreme" limita-

tions in at least one of the six domains.  (Dec. 5-12; Tr. 11-18).  The ALJ determined that

S.N. has "less than marked" limitations in three of the domains and "no" limitations in the

remaining domains.  (Dec. 8-11; Tr. 14-17).  Therefore, he concluded that S.N. has not

been disabled since the date her application was filed.  (Dec. Finding #6; Tr. 18).

The plaintiff does not dispute the ALJ's findings that S.N. has no limitations in the

domains of "moving about and manipulating objects" and "health and physical well-

being."  (Dec. 10-11; Tr. 16-17).  However, the plaintiff disputes the ALJ's conclusion

that S.N. has "less than marked" limitations in the domains of "acquiring and using

information," "attending and completing tasks" and "interacting and relating with others."

(Dec. 8-10; Tr. 14-16).  She also disputes the ALJ's conclusion that S.N. has "no

-17-

limitation" in the domain of "caring for yourself."  (Dec. 10-11; Tr. 16-17).  As detailed

below, this court finds that the ALJ's conclusions are supported by substantial evidence

in the record and that the Commissioner's decision should therefore be affirmed.

Additional factual details relevant to this court's analysis are described below.

### III.  ANALYSIS

#### A.    Standard of Review

In this action, Ms. Nelson, on S.N.'s behalf, is seeking review of the

Commissioner's final decision denying SSI benefits pursuant to sections 205(g) and

1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3).  Those

provisions provide in relevant part as follows:

> [a]ny individual, after any final decision of the Commissioner of
> Social Security made after a hearing to which he was a party,
> irrespective of the amount in controversy, may obtain a review of
> such decision by a civil action ....  The court shall have power to
> enter, upon the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the Commissioner
> of Social Security, with or without remanding the cause for a
> rehearing.  The findings of the Commissioner of Social Security as to
> any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added).  See also 42 U.S.C. § 1383(c)(3) ("[t]he final

determination of the Commissioner . . . shall be subject to judicial review as provided in

section 405(g) . . . .").  The Supreme Court has defined "substantial evidence" to mean

"more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401,

91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938); accord Irlanda Ortiz

v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  It has been

explained that:

> [i]n reviewing the record for substantial evidence, [the court is] to
> keep in mind that "issues of credibility and the drawing of
> permissible inference from evidentiary facts are the prime
> responsibility of the [Commissioner]."  The [Commissioner] may
> (and, under his regulations, must) take medical evidence.  But the
> resolution of conflicts in the evidence and the determination of the
> ultimate question of disability is for him, not for the doctors or for
> the courts.  [The court] must uphold the [Commissioner's] findings
> in this case if a reasonable mind, reviewing the record as a whole,
> could accept it as adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Thus,

the "court's function is a narrow one limited to determining whether there is substantial

evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315,

319 (1st Cir. 1981).  The Commissioner's decision must be affirmed, "even if the record

arguably could justify a different conclusion, so long as it is supported by substantial

evidence."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.

1987), cert. denied, 484 U.S. 1012, 108 S. Ct. 713, 98 L. Ed. 2d 663 (1988).

    This court finds that the application of these principles to the instant case compels

the conclusion that the Commissioner's final judgment denying benefits must be

affirmed.

B.      **Statutory Framework**

The plaintiff bears the burden of proving that she is disabled and entitled to SSI

benefits.  20 C.F.R. § 416.912(a).  A child under the age of 18 is considered disabled and

is thus entitled to SSI if she "has a medically determinable physical or mental impairment,

which results in marked and severe functional limitations, and which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  "Pursuant to this statutory

dictate, the [Social Security Administration] has enacted a three-step sequential analysis

to determine whether a child was eligible for SSI benefits on the basis of a disability."

Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (citing 20 C.F.R. § 416.924(a)).  This

procedure was followed by the ALJ in the instant case, and resulted in the following

analysis as set forth in the ALJ's "Findings of Fact and Conclusions of Law."  (See Dec.

4-12; Tr. 10-18).

The first inquiry is whether a child is working and if the work the child is

performing constitutes substantial gainful activity.  If so, the claimant is automatically

considered not disabled.  20 C.F.R. § 416.924(b).  It is undisputed that S.N. was not

employed and was not engaged in substantial gainful activity.  (See Dec. Finding #2; Tr.

10).  Accordingly, the ALJ addressed the next step in the analysis.

The second inquiry is whether the child has a "medically determinable impair-

ment(s) that is severe."  20 C.F.R. § 416.924(c).  If not, the child is automatically

considered not disabled.  Id.  In the instant case, the ALJ found that S.N. suffered from

-20-

severe impairments consisting of ADHD, depression and bipolar disorder, so his analysis continued. (Dec. Finding #3; Tr. 10). This finding is not at issue in this appeal.

The third inquiry is whether the child has an impairment which meets, medically equals or functionally equals a disability listed in the "Listing of Impairments" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 416.924(d); Pollard, 377 F.3d at 189. If not, or if the impairment does not meet the duration requirement, the child is considered not disabled. 20 C.F.R. § 416.924(d)(2). "An impairment 'meets' the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment. An impairment 'equals' a listed impairment when the set of symptoms, signs and laboratory findings in the medical evidence supporting the claimant are at least equivalent in severity to the set of medical findings for the listed impairment." Martinez Nater v. Sec'y of Health & Human Servs., 933 F.2d 76, 77 (1st Cir. 1991) (internal quotations and citations omitted). Finally, and as detailed more fully below, in order to "functionally equal the listings," a child's impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." 20 C.F.R. § 416.926a(a).

The ALJ in the instant case determined that S.N.'s impairments of depression/bipolar disorder and ADHD did not meet, medically equal or functionally equal the listings for mood disorders or ADHD. (Dec. Finding #4 and 5; Tr. 10-11). The plaintiff

contends that these findings were in error.[5]   This court finds, however, that the ALJ's

decision is supported by substantial evidence.

**C.     Plaintiff's Challenge to the ALJ's Finding that S.N.'s Impairments
        Did Not Functionally Equal the Listings**

The plaintiff argues that the ALJ erred at step 3 of the sequential analysis by not

finding that S.N.'s impairments are functionally equivalent to the listings set forth in the

social security regulations.  In particular, she contends that the ALJ erred in failing to find

that S.N. had "marked" limitations in at least two domains of functioning, or an

"extreme" limitation in at least one domain of functioning.  (Pl. Mem. (Docket No. 14) at

6).  This court disagrees, and finds that the ALJ's finding on functional equivalence was

supported by substantial evidence.  As noted above, in order for an impairment to

_____

[5]   While the plaintiff purports to challenge the ALJ's finding that S.N.'s depression/
bipolar disorder and ADHD did not meet or medically equal a listed impairment (see Pl. Mem.
(Docket No. 14) at 5), she has not developed her argument.  In particular, she has provided no
analysis of the applicable regulatory provisions and has not attempted to show how the evidence
in the record satisfies the relevant criteria for meeting or medically equaling the listed
impairments.  (See Pl. Mem. at 5-6).  "Few principles are more sacrosanct in this circuit than the
principle that 'issues averted to in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived.'" Redondo-Borges v. U.S. Dep't of Hous. &
Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) (quoting United States v. Zannino, 895 F.2d 1, 17, (1st
Cir. 1990)).  This court will limit its analysis accordingly.  In any event, the record establishes that
in 2008, Dr. Coto, a board certified psychiatrist, reviewed the available psychiatric medical
evidence and concluded that while S.N. suffered from a "severe impairment," it did "not meet,
equal or functional[ly] equal a listing impairment."  (Tr. 374).  The ALJ was entitled to rely on
Dr. Coto's uncontradicted opinion in forming his conclusion that S.N.'s impairments did not meet
or equal the listings for mood disorders or ADHD.  See Scheck v. Barnhart, 357 F.3d 697, 700
(7th Cir. 2004) (substantial evidence supported ALJ's finding that plaintiff did not meet or equal a
listing where ALJ relied on opinions of state agency physicians that plaintiff was not disabled).
Thus, the ALJ's finding was based on substantial evidence.

"functionally equal the listings," it must "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ."  20 C.F.R. § 416.926a(a).

For purposes of this analysis, an impairment results in a "marked" limitation when it "interferes seriously with [the child's] ability to independently initiate, sustain or complete activities" or when standardized testing designed to measure ability or functioning in a particular domain yields "a valid score that is two standard deviations or more below the mean, but less than three standard deviations . . . ."  20 C.F.R. § 416.926a(e)(2)(i) & (iii).  An impairment results in an "extreme" limitation when it "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities" or when standardized testing designed to measure ability or functioning in a particular domain yields "a valid score that is three standard deviations or more below the mean . . . ."  20 C.F.R. § 416.926a(e)(3)(i) & (iii).  There are six domains of functioning, which consist of "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being."  20 C.F.R. § 416.926a(b)(1).  At issue in this case is whether the ALJ erred by failing to find that S.N. has marked, if not extreme, limitations in the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others" and "caring for yourself."  (See Pl. Mem. at 6-10).  For the reasons detailed below, this court finds that the ALJ's findings on these matters are supported by substantial evidence in the record.

## <u>Acquiring and Using Information</u>

An assessment of the extent of any limitations in the domain of "acquiring and using information" involves consideration of how well the child is able to acquire or learn information and how well the child uses the information she has learned.  20 C.F.R. § 416.926a(g).  In the instant case, the ALJ found that S.N. has "less than marked" limitations in this domain.  In doing so, the ALJ specifically noted that S.N. had repeated two grades in school, but he concluded that this was most likely due to her poor attendance problems rather than her inability to learn.  (Dec. 8; Tr. 14).  He also referenced Dr. Williams' opinion that S.N. has "the ability to earn average grades at school" as well as S.N.'s own testimony that her most recent grades range from an "A" to a "C-."  (Dec. 8; Tr. 14).

The plaintiff argues that the ALJ's conclusion was not supported by substantial evidence because she is two levels behind other children her age in school and her school records indicate that she has struggled with language comprehension and math reasoning. She also contends that S.N.'s most recent passing grades were earned with the help of "special and intensive school accommodations, a fact not addressed in the ALJ's decision." (Pl. Mem. at 6).  Although the record shows that S.N. has had some struggles in school and receives special education services, there is ample evidence in the record to support the ALJ's conclusion that S.N. has less than marked limitations in her ability to learn and use information.

The record establishes that in 2006, S.N.'s regular classroom teacher completed an assessment in which she indicated that S.N. had only "slight" problems in the area of acquiring and using information as compared to unimpaired children of the same age. (Tr. 197).  Additionally, there is evidence showing that S.N. showed significant academic improvement during the 2006-2007 school year, and that by September 2007, when S.N. was in the third grade, her reading skills were only slightly below average compared to other third grade students.  (Tr. 135, 223).  However, school personnel repeatedly expressed concern about S.N.'s continuing absences, and they attributed her inability to learn new skills and concepts during the 2007-2008 school year to her excessive absence rate.  (See Tr. 100, 163, 196, 202).  This evidence supports the ALJ's finding.

As the ALJ stated in his decision, a finding that S.N. has less than marked limitations in this domain is consistent with Dr. Williams' assessment that S.N. "likely has the ability to earn Average grades at school."  (Tr. 370).  It is also supported by the results of testing administered by Dr. Williams in May 2007.  As detailed above, S.N. was able to obtain average language-based scores and low average math computation scores on academic achievement tests given by Dr. Williams.  (Tr. 370).  Additionally, after evaluating the plaintiff's cognitive test results, Dr. Williams estimated that S.N.'s verbal and nonverbal reasoning abilities similarly fall within the average range.  (Tr. 370).

The ALJ's conclusion is further supported by the opinion of reviewing child psychiatrist, Dr. Coto, that S.N.'s impairment in the domain of acquiring and using information is "Less than marked," as well as by the opinion of S.N.'s own pediatrician.

(Tr. 374, 391).  Specifically, in his assessment of S.N.'s functional capacity, Dr. Georgescu opined that that S.N.'s level of impairment in this domain is "moderate," i.e., less than marked.  (Tr. 391).

The fact that S.N. receives special education services and certain accommodations does not undermine the ALJ's decision.  The record shows that S.N.'s special education classes are limited and that she remains in a regular classroom throughout most of the school day.  (See Tr. 132, 143, 172).  Moreover, contrary to the plaintiff's assertion, the ALJ considered the fact that S.N. requires some special education classes and reasonable accommodations in school.  (Dec. 6; Tr. 12).  However, he emphasized the fact that, as detailed above, S.N.'s second grade teacher determined that the plaintiff had only a "slight problem" in the domain of acquiring and using information when compared with unimpaired children her age.  (See Dec. 6; Tr. 12).  Thus, the ALJ properly weighed evidence that S.N. receives certain accommodations in rendering his decision about the severity of her limitations.

Finally, the ALJ was not compelled to accept the assessment of consulting psychologist Dr. Collins-Wooley that S.N. had marked impairments in the domain of acquiring and using information.  "[T]he resolution of conflicts in the evidence and the drawing of conclusions from such evidence are for the [Commissioner]."  Irlanda Ortiz, 955 F.2d at 769.  As detailed above, the consulting doctors' assessment is inconsistent with other evidence in the record, including but without limitation, the opinion of S.N.'s own pediatrician.  Therefore, the ALJ's decision to reject that assessment, and his

-26-

conclusion that S.N. has "less than marked" limitations in this domain was supported by the record as a whole.

### Attending and Completing Tasks

In evaluating the extent of any limitations in the domain of attending and completing tasks, consideration is to be given to how well the child is able to focus and maintain attention, and how well the child begins, carries through and finishes activities, including the pace at which the child performs activities and the ease with which she changes them.  20 C.F.R. § 416.926a(h).  The ALJ found that S.N. has "less than marked" limitations in this domain. In support of his conclusion, the ALJ specifically referred to the opinion of Dr. Collins-Wooley that S.N. had only mild inattentiveness and was doing well on her medication, and to the fact that S.N.'s most recent grades in school were good despite her difficulty completing homework assignments.  (Dec. 9; Tr. 15).

The plaintiff, in challenging the ALJ's finding on this issue, points to evidence in S.N.'s school records and from her psychological evaluations documenting S.N.'s problems with attention and impulsivity.  (Pl. Mem. at 7).  While this evidence provides some support for the conclusion that S.N. exhibits a short attention span and lack of concentration, it does not compel the conclusion that her limitations in these areas are "marked."  For example, in the December 2006 written assessment of S.N.'s functional abilities, S.N.'s regular classroom teacher indicated that the plaintiff had a "serious problem" completing class/homework assignments and an "obvious problem" completing work accurately without careless mistakes, but had only a "slight problem" or "no

problem" with ten other activities that fall within the domain of "attending and completing tasks." (See Tr. 198). Thus, the teacher's assessment is consistent with the ALJ's conclusion that S.N.'s limitations are less than marked. Moreover, the ALJ considered the 2006 assessment, and suggested that S.N.'s inability to complete her work may have had more to do with her excessive absences from school than from her psychological problems. (See Dec. 7; Tr. 13). As described above, the record demonstrates that S.N.'s extensive absences from school have interfered with her academic progress. (See Tr. 163).

The record also shows that during S.N.'s psychological evaluation in March 2005, S.N. showed signs of impulsivity. (Tr. 97). However, the examining psychologist also noted that S.N.'s "effort and attention to task were considered very good." (Id.). Furthermore, on the second day of testing, when S.N. was more talkative and restless, the psychologist stated that she was nevertheless "easily redirected to task." (Id.). Accordingly, this evidence supports rather than undermines the ALJ's conclusion regarding the severity of S.N.'s functional limitation.

The plaintiff argues that Dr. Hirsch's psychological evaluation provides evidence of a marked impairment in attending and completing tasks. (Pl. Mem. at 7). During his psychological evaluation of S.N. in March 2007, Dr. Hirsch noted that the plaintiff's attention span "was found to be somewhat variable." (Tr. 350). However, S.N. was able to tolerate the testing session, and Dr. Hirsch did not evaluate or further comment on the

severity of her attention difficulties.  (See Tr. 349-52).  Accordingly, this evidence is not

inconsistent with the ALJ's decision.

The plaintiff also suggests that the ALJ erred by failing to adopt the opinion of

S.N.'s treating physician, Dr. Georgescu, that the plaintiff has a "marked" level of

impairment in attending and completing tasks.  (Pl. Mem. at 7).  "'Controlling' weight is

typically afforded a treating physician's opinion on the nature and severity of an

impairment where it is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence' in the

claimant's case."  Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting

20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)).  Nevertheless, the ALJ may "downplay

the weight afforded a treating physician's assessment of the nature and severity of an

impairment where . . . it is internally inconsistent or inconsistent with other evidence in

the record including treatment notes and evaluations by examining and nonexamining

physicians."  Id.  See also 20 C.F.R. § 416.927(d)(2)-(4).  Thus, the ALJ in the instant

case was entitled to reject Dr. Georgescu's opinion regarding the extent of S.N.'s

functional limitations in the domain of attending and completing tasks to the extent he

had a reasonable basis for doing so.  See Monroe v. Barnhart, 471 F. Supp. 2d 203, 211

(D. Mass. 2007).

This court finds that Dr. Georgescu's opinion was inconsistent with other evidence

in the record.  In addition to the opinion of S.N.'s teacher that the plaintiff had only

"slight" or "no" problems with most of the tasks included within the domain of attending

and completing tasks, Dr. Collins-Wooley, a consulting psychologist, determined that

S.N. has "less than marked" limitations in this domain, and that she exhibited only "mild

inattentiveness." (Tr. 355). As stated above, the ALJ relied on this assessment in

rendering his decision. Furthermore, the reviewing child psychiatrist, Dr. Coto, stated

that S.N. has only "a slight problem focusing long enough to finish a task, carrying out

multi-step instructions and working at a reasonable pace." (Tr. 373). He further

determined that she has "Less than marked" limitations in the domain at issue. (Tr. 374).

Although Dr. Collins-Wooley and Dr. Coto are not treating physicians, their

specializations in psychology and psychiatry are particularly relevant to the issues

presented in this case. Therefore, it was reasonable for the ALJ to credit their opinions

over the opinion of S.N.'s pediatrician.

Finally, as the ALJ pointed out in his decision, clinicians at Seven Hills noted that

S.N.'s diagnosis of bipolar disorder with ADHD "was characterized by a 'lowest . . .

highest' [Global Assessment of Functioning ("GAF")] of '60.'"[6] (Dec. 7; Tr. 13; see also

Tr. 324, 326). A GAF score of 60 indicates only "[m]oderate symptoms . . . OR

moderate difficulty in social, occupational, or school functioning . . . ." Lust v. Comm'r

of Soc. Sec., Civil Action No. 10-261, 2010 WL 2773205, at *1 n.8 (W.D. Pa. July 13,

---

[6] "The GAF scale considers psychological, social and occupational functioning on a
hypothetical continuum of mental health to mental illness. It is used by mental health profes-
sionals to assess an individual's current treatment needs and provide a prognosis." Lust v.
Comm'r of Soc. Sec., Civil Action No. 10-261, 2010 WL 2773205, at *1 n.8 (W.D. Pa. July 13,
2010) (slip op.).

2010) (slip op.) (citing American Psychiatric Association: *Diagnostic and Statistical*

*Manual of Mental Disorders, Fourth Edition*, Text Revision (2000), at 34) (boldface

omitted.  See also Wilson v. Astrue, 602 F.3d 1136, 1142 n.3 (10th Cir. 2010) (same).

Thus, the records from Seven Hills provide further support for the ALJ's finding that S.N.

has less than marked limitations in the domain of attending and completing tasks.

Accordingly, this court concludes that the ALJ's decision on this issue, including his

decision to reject Dr. Georgescu's opinion, was based on substantial evidence.

### Interacting and Relating with Others

In evaluating the severity of a claimant's limitations in the domain of "interacting

and relating with others," consideration must be given to how well the child is able to

initiate and sustain emotional connections with others, develop and use the language of

the child's community, cooperate with others, comply with rules, respond to criticism,

and respect and care for the possessions of others.  20 C.F.R. § 416.926a(i).  Again, the

ALJ in the instant case determined that S.N. has "less than marked" limitations in this

domain.  In support of his finding, the ALJ specifically referenced Dr. Collins-Wooley's

assessment that the plaintiff "has only 'slight' difficulty moderating anger and seeking

attention appropriately per her teacher," and noted that "[a]side from some sibling rivalry,

the claimant does not appear to have significant ongoing difficulty getting along with

others particularly in the school environment."  (Dec. 10; Tr. 16; see also Tr. 355).

Furthermore, as part of his decision, the ALJ considered S.N.'s testimony that she gets

along with her teachers "good," does not get into trouble at school, has friends in the

fourth and fifth grades with whom she gets along "good," and sees some of her school friends at home.  (Dec. 5-6; Tr. 11-12).  However, the ALJ chose to discredit Ms. Nelson's testimony as to the severity of S.N.'s symptoms, explaining that Ms. Nelson's testimony was inconsistent with S.N.'s own statements regarding her numerous friends and success at school, with evidence from S.N.'s teachers and an examining psychologist that S.N. had "no problem" up to only moderate symptoms, and with the fact that S.N. has not received ongoing psychological or psychiatric treatment for her complaints. (Dec. 7; Tr. 13).

The plaintiff contends that the ALJ's finding with respect to the severity of S.N.'s limitations in this domain is not based on substantial evidence because the record "shows that S.N. has a marked, if not extreme, limitation in the category of interacting with others."  (Pl. Mem. at 9).  In particular, the plaintiff points to Dr. Georgescu's opinion that S.N. suffers from an extreme level of impairment in this category of functioning, as well as evidence suggesting that S.N. has difficulties controlling her behavior.  (Id.). Although the record indicates that S.N. has some behavioral issues, especially at home, it contains substantial evidence supporting the ALJ's determination that S.N.'s limitations in this area are "less than marked."

As an initial matter, the ALJ's finding is supported by the opinions of Dr. Collins-Wooley and Dr. Coto that S.N. has "less than marked" limitations in her ability to interact and relate with others.  (Tr. 355, 374).  It is also consistent with the assessment of S.N.'s second grade teacher that the plaintiff had mostly "no problem" and only a few "slight

problems" with activities falling within the relevant domain.  (Tr. 199).  Furthermore, as

the ALJ noted in his decision, S.N.'s own testimony reveals that she is able to form

relationships, cooperate with others and comply with rules.  (<u>See</u> Tr. 26, 28, 29, 32).

  In addition, the record contains various references to the fact that S.N. behaves

well in school, is friendly and outgoing, and interacts well with others.   For example, but

without limitation, in 2005, S.N.'s special education teacher stated that the plaintiff

"interacts well with her peers and adults," and an examining psychologist described S.N.

as "a friendly and pleasant student."  (Tr. 95-96).  Similarly, S.N.'s 2006-2007 IEP

describes her as "very outgoing," "social" and "friendly," and clinicians at Seven Hills

also described her strengths as "outgoing" and "friendly."  (Tr. 135, 325).  The Seven

Hills clinicians further noted that while the plaintiff has temper tantrums at home, she

"[b]ehaves well in school" and has "good" relationships with everyone in her family

except her oldest half sister.  (Tr. 330, 338).  Furthermore, in March 2007, Dr. Hirsch

reported that the plaintiff "enjoys playing with her friends," that there was no indication

of a behavior problem at school, and that "[h]er mother does not describe her having any

significant behavioral problems at home."  (Tr. 352).  Thus, the ALJ's determination as to

the extent of S.N.'s limitations in the third domain of functioning is substantially

supported by the record.

  Nevertheless, the plaintiff argues that the ALJ erred by disregarding relevant facts

concerning S.N.'s behavior and ability to get along with others.  Specifically, the plaintiff

points to testimony from S.N.'s mother regarding S.N.'s attempt to harm her brother with

a knife, and S.N.'s verbal assaults on her friends and older brother.  (Pl. Mem. at 9).  She

also points to S.N.'s statements that she hits and scratches her brother, sometimes feels

angry and frustrated at her mother and younger brother, and has hit her mother on three

occasions.  (Id.).  The plaintiff's argument is unpersuasive.  As an initial matter, the ALJ

specifically considered this testimony, as well as "the entire record" in connection with

his decision.  (See Dec. 4-5; Tr. 10-11).  Moreover, to the extent he discredited Ms.

Nelson's testimony as to the severity of S.N.'s symptoms, he provided reasons for doing

so.  (See Dec. 7; Tr. 13).  Therefore, his decision as to how to weigh the relevant

testimony is entitled to "[c]onsiderable deference" and will not be disturbed.  See Ortiz

Rosado v. Barnhart, 340 F. Supp. 2d 63, 66-67 (D. Mass. 2004) (court must give

considerable deference to ALJ's credibility findings where ALJ considered entire case

and gave reasons for weight given to individual's statements).

### Caring for Yourself

Finally, the plaintiff challenges the ALJ's finding that S.N. has "no limitation" in

the domain of "caring for yourself."  (See Dec. 11; Tr. 17).  An assessment of the extent

of any limitations in this domain involves consideration of how well the child maintains a

healthy emotional and physical state, including how well the child satisfies her physical

and emotional wants and needs in appropriate ways.  20 C.F.R. § 416.926a(k).  This

includes how well the child copes with stress and changes in her environment, and

whether the child takes care of her own health, possessions and living area.  Id.

The plaintiff argues that S.N. has a marked impairment in this domain, as evidenced primarily by her mother's testimony that S.N. engaged in self-injurious behavior by attempting to swallow sleeping pills and that she had to hide the kitchen knives out of fear that S.N. would harm herself or her younger brother.  (Pl. Mem. at 9-10).  The plaintiff also points to testimony indicating that S.N. has to be told to shower, has difficulty waking up in the morning, and sometimes takes a supplement to help her sleep at night.  (Id. at 10).  Again the record shows that the ALJ considered this evidence, but chose to discredit S.N.'s and her mother's statements regarding the extent of S.N.'s limitations on the grounds that they were inconsistent with other evidence in the record.  (See Dec. 5-7; Tr. 11-13).  This court finds that the record, considered as a whole, supports the ALJ's finding regarding the level of S.N.'s impairment in her ability to care for herself.

Significantly, none of the medical sources found that S.N. has a marked impairment in this area of functioning.  Rather, both Dr. Collins-Wooley and Dr. Coto determined that S.N. had "no limitation" the domain of caring for yourself.  (Tr. 356; 374).  Moreover, although Dr. Georgescu noted S.N.'s alleged attempt to swallow sleeping pills, describing it as a "questionable suicidal gesture," he nevertheless concluded that S.N. suffered only a "moderate" impairment in her ability to care for herself.  (Tr. 392).  Thus, the ALJ's finding is supported by the opinions of medical professionals who evaluated S.N.'s functioning in the relevant domain.

Additional evidence further supports the ALJ's conclusion on this issue.  For example, S.N.'s second grade teacher observed "no problems" in S.N.'s ability to care for herself.  (Tr. 201).  Furthermore, clinicians at Seven Hills who evaluated S.N. remarked that the plaintiff "needs reminders to do self-hygiene.  But is capable."  (Tr. 340).  They also noted that she helps with chores such as vacuuming and laundry.  (Id.).  In addition, Dr. Hirsch stated in his 2007 consultative examination report that S.N. "is capable of attending to her daily personal hygiene needs (within developmentally appropriate limits)."  (Tr. 352).  Therefore, the ALJ's decision on this issue is supported by substantial evidence in the record.

Because the ALJ's findings with respect to the severity of S.N.'s limitations in the four domains at issue were based on substantial evidence, his conclusion that S.N.'s impairments or combination of impairments did not functionally equal the listings is entitled to deference and must be upheld.  Accordingly, the defendant is entitled to a ruling in his favor.

### D.     The Plaintiff's Request for a Remand

The plaintiff contends that because the ALJ failed to consider the effects of all of S.N.'s impairments in his decision, the matter should be remanded to the Commissioner for a rehearing and readjudication at the agency level.  (Pl. Mem. at 10).  "When an agency has not considered all relevant factors in taking action, . . . the reviewing court ordinarily should remand the case to the agency."  Seavey v. Barnhart, 276 F.3d 1, 12 (1st Cir. 2001).  However, as detailed above, the ALJ did consider all of the relevant evidence

in rendering his decision on disability.  Therefore, the plaintiff's request for a remand is denied.

## IV.  <u>CONCLUSION</u>

For all the reasons detailed herein, this court finds that the Commissioner's decision that S.N. has not been "disabled," as defined in the Social Security Act, since December 15, 2006, the date her application for SSI benefits was filed, was supported by substantial evidence.  Therefore, the plaintiff's motion for an order reversing or remanding the Commissioner's decision (Docket No. 14) is DENIED and the "Defendant's Motion for Order Affirming the Decision of the Commissioner" (Docket No. 15) is ALLOWED.

      / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge